## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **GARY F. DILLARD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 3:14-cv-0903** |
| | ) | **Judge Trauger** |
| **v.** | ) | |
| | ) | |
| **TYCO INTEGRATED SECURITY, LLC ,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Pending before the court is a Motion for Summary Judgment filed by the defendant, Tyco Integrated Security, LLC (Docket No. 16), to which the plaintiff has filed a Response in opposition (Docket No. 24), and the defendant has filed a Reply (Docket No. 28).  For the reasons stated herein, the defendant's Motion for Summary Judgment will be granted and the plaintiff's claims will be dismissed.

## BACKGROUND

### I.      Overview

The plaintiff, Gary Dillard, filed this employment discrimination action against his former employer, Tyco Integrated Security, LLC ("Tyco").  Tyco sells, services, and installs electronic security systems for large commercial buildings.  Dillard worked in a variety of sales positions with Tyco and its predecessors between February 1990 and his termination on January 3, 2014.  Dillard, who is currently 63 years old, filed this lawsuit on April 3, 2014, alleging that Tyco terminated him because of his age in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* ("ADEA") and the Tennessee Human Rights Act, T.C.A. § 4-21-101 *et seq.* ("THRA").

**II.    The Motion for Summary Judgment**

In support of its Motion for Summary Judgment, Tyco filed (1) a Memorandum of Law (Docket No. 17), (2) a Statement of Undisputed Facts (Docket No. 18) ("DSUF"), (3) an Appendix, attaching a variety of depositions and exhibits (Docket No. 19, Exs. 1-6), and (4) two witness declarations, including exhibits (Docket Nos. 20-21).

In support of his opposition to the motion, Dillard filed (1) a Response in Opposition (Docket No. 24), (2) a response to Tyco's DSUF (Docket No. 25), (3) a Statement of Additional Disputed Facts (Docket No. 25) ("PSAF"), and (4) a Notice of Filing attaching a variety of deposition transcripts and exhibits (Docket No. 26).

In support of its Reply, Tyco filed a Response to Dillard's PSAF (Docket No. 27), as well as an Appendix attaching interrogatories and exhibits (Docket No. 29) and the Declaration of Darryl Davis (Docket No. 30).

**III.    Facts Underlying the Plaintiff's Claims**[1]

**A.  Dillard's Role at Tyco**

Tyco terminated Dillard's employment on January 3, 2014.  At relevant times prior to his termination, Dillard worked as a Core Commercial Resale Representative.  In this role, Dillard was primarily responsible for reselling electronic security systems to new tenants who occupied buildings that had previously installed (but currently discontinued) Tyco security systems. Dillard was also responsible for "dispositioning" each of the prospects that showed up on a list of customers assigned to him in Tyco's "customer relationship management computer application,"

---

[1] Unless otherwise noted, the facts are drawn from the parties' respective statements of fact (taking into account the parties' objections) and the underlying record, drawing all reasonable inferences in favor of the plaintiff.

which is known as Compass.  Tyco requires its sales representatives and their managers to use the Compass system throughout the sales process, which includes tracking, dispositioning, and recording customer prospect and sales information, creating contracts and booking contracts.

The majority of Dillard's "resale prospects"—*i.e.*, the potential customers that Tyco assigned to Dillard so that he could try to sell them Tyco's product—were listed in Compass as "discontinued leads," nicknamed "discos."  Within 24 hours of a processed "disco" form, Dillard's resale prospects would appear in Compass under the "leads" tab in the Compass system.  Dillard could attempt to sell services to any disco lead that showed up on his Compass list.

Tyco set forth minimum expectations for Dillard's performance, including (1) making at least five customer proposals each week; (2) proposing at least $10,000 per week in annual service charges ("ANSC"); (3) meeting minimum sales quotas from booked sales; (4) updating active opportunities in Compass within 24 hours after each customer visit or follow-up call; and (5) updating all proposals and pulling upcoming week forecasts from Compass by every Friday.

It is undisputed that Dillard struggled to use the Compass system to perform his job responsibilities.  Until Tyco went through an organizational shift in 2012, Dillard paid an administrative assistant for several years (out of his own pocket) to access the Compass system and to make sure that his disco leads were up to date.  Dillard also testified at deposition that, at some points in time, other coworkers in the office performed his work on the Compass system on his behalf.

**B.  Dillard Receives Performance Reviews**

      1.  <u>Tyco's System for Disciplinary Review Related to Poor Performance</u>

Tyco has several stages of written disciplinary review for employees who fail to meet their performance goals. The first stage appears to be a "Coaching for Improvement" form ("CIF"), which describes the standard performance expectations, the team member's current performance, and an action plan for improving performance, including actions to be taken by the team member and his manager. The second and more severe disciplinary stage is a Performance Improvement Plan ("PIP"), which describes the employee's performance deficiencies, defines the improvements needed, and identifies an action plan for improvement. It appears that, even after an employee is placed on a PIP, Tyco may also issue "written warnings" related to the employee's failure to improve or meet the objectives of the PIP's action plan.

2. Dillard's Performance History Prior to 2012

It appears to be undisputed that, throughout his employment with Tyco (and its affiliates), Dillard went through various periods of poor performance and that Tyco disciplined him for that poor performance. There is evidence in the record that, between 2008 and 2010, Dillard received multiple written warnings related to his failure to meet his sales quotas, including multiple CIFs and a PIP in 2009. It further appears to be undisputed that Dillard's performance improved at some point following the 2009 PIP and, therefore, Tyco did not take further disciplinary action against him at that time. The plaintiff's age discrimination claims are tied to disciplinary actions taken against him beginning in January 2013, which are described in detail below.

3. First Coaching for Improvement Form

In October 2012, Darryl Davis became Dillard's sales manager. On January 18, 2013, Davis gave Dillard a written CIF ("First CIF"). According to the First CIF, Dillard was averaging 0.4 proposals instead of five proposals per week for the first quarter of the 2013 fiscal year. Dillard was also averaging $524 in ANSC (rather than the expected $10,000), and he

worked at only 55.47% of his sales quota for the first quarter and 28.9% of his quota for December 2012.

The First CIF instructed that Dillard was expected to take actions to improve his performance, including "clean[ing] up Compass leads and focusing attention on Non-Payment Cancellations." (Docket No. 19, Ex. 1 at 32.) The First CIF further stated that Dillard should "[a]lways use Compass generated lead to create resale opportunity." (*Id.*)

### 4. Second Coaching for Improvement Form

On March 19, 2013, Dillard received a second CIF form ("Second CIF"). The Second CIF noted that Dillard was continuing to fail to meet minimum expectations for proposals, proposed ANSC, and sales quotas. (*Id.* at 33.) The Second CIF reiterated the same objectives as the First CIF.

### 5. Performance Improvement Plan

On August 6, 2013, Tyco placed Dillard on a PIP (*Id.* at 34.) At the time of his PIP, Dillard was meeting only 33% of his sales quota in July and 54.5 % of his sales quota year-to-date. He had generated only 4 proposals in July (despite a weekly expectation of five proposals) and had only achieved $4,828 of his expected $10,000 in proposed ANSC. The PIP form, signed by Davis and Dillard, states that the reasons for this discipline included (1) Dillard's failure to meet the minimum expectations for proposals, proposed ANSC, and sale quotas; and (2) his failure to properly disposition disco and pending disco leads in Compass. The PIP form further states in a section titled "Define Improvement Needed" that Dillard must improve to a minimum of 80% of his monthly quota, attain a minimum weekly proposal target of 5 proposals and $10,000 in ANSC, and properly follow up and disposition all Compass leads in a timely manner. (*Id.*)

5

The "Action Plan" set out three objectives for Dillard to perform daily: "(1) creat[ing] proposals for resale opportunities before presenting contracts to customers; (2) review[ing] all disco and pending disco leads in compass [*sic*] daily; and (3) review[ing] training material on Compass's Sharepoint site for navigating Compass and creating opportunities and estimates." (*Id.*) The PIP form further stated in capital, bold letters that a "failure to maintain sustained, consistent, satisfactory performance or failure to adhere to the terms and conditions of this performance improvement plan shall result in immediate discipline up to and including termination." The PIP form set a follow-up meeting for September 10, 2013.

### C. Evidence Related to Allegations that Davis Diverted Leads and Offered Dillard's Job to Younger Coworkers

During his employment, Dillard was the sole "core account resale" representative in the Nashville office of Tyco. Other employees in the office were also sales representatives, but they appear to have worked on different sales leads based on the territories to which they were assigned. Dillard alleges that, because Dillard was over 40 years old, Davis both diverted his resale leads to younger sales representatives and offered Dillard's job to his younger coworkers.

#### 1. Diversion of Leads

Dillard identified Kinsey Hudson and Michael Upchurch as two employees to whom Davis diverted Dillard's sales leads. Hudson was born in 1986 and is currently 29 years old. Upchurch was born in 1953 and is currently 61 years old.

It appears to be undisputed that, after he became Dillard's manager, Davis would at times offer Dillard's sales leads to the entire sales team. It appears that Davis did so in order to increase performance on resale leads where Dillard was failing to meet expectations. It is further undisputed that, in August 2013, Davis gave Hudson (alone) a list of resale lead opportunities

that would typically fall within Dillard's leads.  It is further undisputed that, on September 24,

2013, Davis sent an email reflecting the list of leads that he had given to Hudson and indicated

that he was considering Hudson to replace Dillard.

According to Dillard, he became aware that Davis had diverted his sales leads between

June and September 2013.  It is undisputed that Dillard was reprimanded in writing for not

meeting his sales quotas before he became aware of the lead diversions.

### 2.  Davis Inquires Whether Other Employees Are Interested in Dillard's Job

Dillard further complains that Davis offered Dillard's job to two younger coworkers,

Hudson and Dawson Braden.  Dawson Braden was born in 1981 and is currently 34 years old.

At deposition, Braden testified that, in July 2013, Davis met with Braden in a one-on-one

review.  (Docket No. 26, Ex. 5 at 19-20.)  Braden further testified that, at the review meeting,

Davis said that Braden's performance was below expectations at that point in time and Davis

suggested that it might be a good idea for Braden to take the Core Commercial Resale

Representative position—Dillard's position.  (*Id.*)  Braden further testified that he eventually

declined the offer to take the resale job because he felt that it would hurt Dillard, with whom he

worked closely.  (*Id.*)

Hudson testified at deposition that, at some point in time, Davis communicated to

Hudson that there was a possibility that a resale position would become open in the future.

(Docket No. 6, Ex. 4 at 17-20.)  Hudson testified that Davis "said [to her] there were changes

coming and it had to do with resale."  (*Id.* at 18.)  Hudson further testified that, although she was

not offered Dillard's position, she felt that Davis "introduced her to the idea of it," but she never

acted on the opportunity.  (*Id.*)

### D.  Dillard Calls the Ombudsman Concern Line

On September 9, 2013, Dillard called the Ombudsman Concern Line to make a formal complaint and spoke with a human resources representative, Lewis Strange.  Dillard specifically complained that he was "not making his sales quota and that his leads were being diverted to someone else in the department."  Dillard further complained that his job had been offered to other employees.  At his deposition, Dillard testified that he gave Strange the name of Ben Piasecki, a coworker, as an individual that Strange could contact in the course of his investigation of the complaint.  (Docket No. 19, Ex. 1 at 54-55.)  Dillard further testified that "the crux of the conversation was the diversion of leads and two other people much younger than me being offered my job."  (*Id.* at 116.)

E.  <u>Strange Investigates Dillard's Complaint</u>

Following Dillard's complaint, Strange performed an investigation.  According to Strange's investigation notes and related communications, Davis informed Strange that Dillard had never learned to navigate the Compass system and, consequently, was performing below expectations with respect to sales.  (Docket No. 19, Ex. 4 a t17-23.)  Strange's notes further state that Dillard admitted to Strange in an interview related to the investigation that he was not strong on computers.  The notes further state that Dillard told Strange in the interview that Dillard "knew that he would probably be let go for his numbers soon and wanted to know what kind of severance package we would give him."  (*Id.* at 18.)  In a follow-up interview on September 27, 2013, Strange's notes state that he spoke to Dillard and that Dillard stated that he used paid vacation days for most of the month.

Strange also interviewed Ben Piasecki, Davis, and two additional supervisors, Manning Billeaud and Mike Cook.  With respect to Piasecki, Strange's notes state:

Ben stated that the office was very close and they all spoke to each other.  He felt that the perception was that Gary was not being treated fairly. He stated that he knew of two other people who had been asked to work in resales by Manager Davis and that was wrong as that was Gary's job currently and he should not have asked anyone until there was a [*sic*] open position.  Ben stated that he had seen Manager Davis give another employee leads that were resales (Kinsey Hudson).  Ben questioned why only one person was getting the leads if they were going to share them.  Ben admitted that Gary has struggled with how to get leads from the compass system and validated that Gary had paid someone cash in ADT, an admin in the past to get those leads for him, however that had stopped since the split.  He said that previous managers had allowed Gary this kind of leniency but Daryl [*sic*] wanted everyone to be using compass themselves and not have people helping each other out as it affected others [*sic*] productivity.  Ben also went on to say that others wanted a chance to work with the resale's [*sic*] if Gary did not make it and that they should post the position or share leads with the territory.

(*Id.* at 18.)  It is undisputed that Mr. Strange did not interview Hudson or Braden regarding their conversations with Davis about Dillard's job and his resale leads.

### F.  Dillard's Performance Following the PIP

After Dillard was placed on the PIP, he took 15 vacation days in September and, consequently, was absent from work for most of the month.

### 1.  September 17, 2013 Written Warning

On September 17, 2013, Davis and Dillard signed a memorandum titled "WRITTEN WARNING – UNACCEPTABLE PERFORMANCE."  (*Id.* at 35.)  The written warning stated that, despite the PIP, Dillard's performance continued to decline throughout August and September.  It states, "[s]ince given that Performance Improvement Plan, you were -19% to quota for the month of August with 2 proposals created.  To date for the month of September you are 0% to quota and you have 0 proposals completed.  As a result you are now 46.85% to your yearly sales quota."  The written warning further informed Dillard that he would "need to show immediate and sustained improvement, meeting all performance targets and action items as required by [the PIP]" and that "failure to do so [would] result in further disciplinary action, up

to and including termination." (*Id.*) The memo further noted that "part of [Dillard's] failure to succeed" was due to his "lack of knowledge of the Compass system." (*Id.*) As part of the warning, Tyco required Dillard to complete three training modules within 30 days related to the Compass system.

      2.  <u>Dillard's Performance Improves</u>

It is undisputed that, in October and early November 2013, Dillard's performance improved with respect to his sales quotas. Despite this improvement, however, it appears to be undisputed that Dillard did not complete the three training modules assigned to him in the September 17, 2013 written warning.

**G. Final Written Warnings and Dillard's Termination**

On December 9, 2013, following another downturn in Dillard's performance, Davis sent Dillard an additional written warning, informing Dillard that he was continuing to perform below his minimum job obligations, including failing to meet his sales quotas, proposal minimums, ANSC requirements, and failing to improve his work in the Compass system. (Docket No. 26, Ex. 8.) The written warning instructed that, without immediate and sustained improvement, Dillard would be subject to further disciplinary action, up to and including termination. (*Id.*)

On December 30, 2013, Davis sent an email to Billeuad and Strange documenting Dillard's numbers for December, which were again below expectations. Davis wrote, "I would like to proceed with the termination on Thursday when he returns if everyone is okay with it." (Docket No. 26, Ex. 9.) Strange and Billeaud responded separately and indicated that they agreed with the plan to terminate Dillard. (*Id.*)

Tyco terminated Dillard on January 3, 2014. Davis testified at his deposition that Tyco terminated Dillard because he failed to meet his sales quota and to follow the Compass system.

10

It is undisputed that, to date, Tyco has not filled the Core Commercial Resale Representative position.  It is further undisputed that the resale leads, which previously were assigned to Dillard as the Core Commercial Resale Representative, are being distributed to all Commercial Sales Representatives by their respective assigned territories.[2]

### H.  Davis Makes Statements Regarding New Positions after Dillard's Termination

It is undisputed that Dillard does not recall Davis ever making any age-related comments during his employment with Tyco.

About one week after Dillard was terminated, Davis held a team meeting.[3]  Davis testified at deposition that, at the meeting, he informed team members that Tyco had created a new position called a business services sales representative and informed the team that they could refer individuals and receive a referral fee if the individual was hired.  (Docket No. 19, Ex. 3 at 115-116.)   Davis further testified that, for this particular position, Tyco had "certain criteria" for candidates—specifically, "fresh faces."  (*Id.*)  Davis testified that he further

---

[2] The defendant submits as an undisputed statement of fact: "Dillard was not replaced.  To date, the Core Commercial Resale Representative position has not been filled and the resale leads are being distributed to all Commercial Sales Representatives by their respective assigned territories." (Docket No. 25 ¶ 32.)  The plaintiff responded: "Undisputed that defendant has not filled the Core Commercial Resale Representative job, with the clarification that Darrell [*sic*] Davis and defendant determined to terminate Mr. Dillard on August 6, 2013.  At approximately the same time, Mr. Davis offered Mr. Dillard's Core Commercial Resale Representative job to two considerably younger existing employees – Dawson Braden and Kinsey Hudson.  Piasecki Dep. at 25-26, 30, 34; Braden Dep. at 18; Hudson Dep. at 13-18.  Likewise, in a meeting on the Monday following the plaintiff's Thursday termination, Mr. Davis said he had some positions to fill and defendant was looking for people 'fresh out of college' and no 'retreads.'  Piasecki Dep. at 57, 62-62." (*Id.*)

[3] Dillard was not present at this meeting.  The parties have not explained how Dillard learned of the meeting or of Davis's comments to the sales team.

informed his team that the company wanted individuals with no industry experience, which would most commonly include recent college graduates without significant work experience.

Piasecki, who attended the meeting, testified at his deposition that he recalled Davis informing his team that the company was looking for individuals "fresh out of college" for "some" open positions. (Docket No. 19, Ex. 2 at 63-64.) He further recalled Davis using the term "no retreads." Piasecki defined a "retread" as "an individual with experience in sales and also in the industry, who would potentially bring over bad habits and practices from their previous companies or experience." (*Id.* at 63-64.)

## ANALYSIS

### I.      The Plaintiff's Alleged Retaliation Claim

As an initial matter, in his Response in opposition to the motion, the plaintiff claims (for the first time in this case) to have asserted a retaliation claim under Tennessee common law against the defendant. The plaintiff further contends that, because the defendant did not address the plaintiff's new retaliation claim in its summary judgment motion, the retaliation claim must proceed to trial. As the defendant points out, however, the plaintiff did not plead a retaliation claim in his Complaint, and the deadline for amended pleadings in this case expired on September 5, 2014. (Docket No. 1 (Complaint); Docket No. 11 (Case Management Order.) Accordingly, the plaintiff's retaliation claim is improper, and the court need not consider the claim for purposes of the defendant's motion.

### II.      Rule 56 Standard

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue

of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

III.   **The Plaintiff's Age Discrimination Claims**

A.  **Discrimination Claims under the ADEA and THRA**

The plaintiff's ADEA and THRA age discrimination claims are analyzed according to the same framework as federal discrimination claims under Title VII. *Policastro v. Nw. Airlines*, 297 F.3d 535, 538-39 (6th Cir. 2002) (ADEA); *Lynch v. City of Jellico*, 205 S.W.3d 384, 399 (Tenn. 2006). That is, where, as here, there is no allegation of direct evidence of discrimination, a claim of age discrimination is analyzed under the familiar burden-shifting analysis set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined by *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981). Under the *McDonnell Douglas*

framework, the plaintiff must first establish a *prima facie* case of discrimination.  In order to establish a *prima facie* case of age discrimination, the plaintiff must show that (1) he is at least 40 years old; (2) he was subject to an adverse employment decision; (3) he was qualified for the position; and (4) he was replaced by a significantly younger person (that is, by someone more than six years younger).  *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003).

If the plaintiff makes a *prima facie* showing, "the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action."  *Clay v. United Parcel Serv.*, 501 F.3d 695, 704 (6th Cir. 2007).  To meet this burden, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for its decision. *Id.*; *see also Berry v. City of Pontiac*, 269 F. App'x 545, 549 (6th Cir. 2008).  If the defendant is successful, the burden then "shifts back to the plaintiff to show that the defendant's proffered reason is a pretext for unlawful discrimination."  *Bryson v. Regis Corp.,* 498 F.3d 561, 570 (6th Cir. 2007).  To make this showing, the plaintiff retains the ultimate burden of producing "sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that [the defendant] intentionally discriminated against [him]."  *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001).

### B.  Application

#### 1.  *Prima Facie* Case

The parties agree that Dillard has satisfied the first three elements of his *prima facie* case. However, the defendant contends that Dillard was not replaced, because it is undisputed that Dillard's responsibilities were absorbed by other members of the commercial sales team based on their territories.  Upon review of the record, the court agrees.  The plaintiff admits that it is undisputed that he has not been replaced.  (Docket No. 25 ¶ 32.)  Moreover, he does not dispute

14

that the Core Commercial Resale Representative position has not been filled and that his leads have been redistributed to other sales representatives. It is well settled that "[a] person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." *Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990); *see also Lilley v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992) ("Spreading the former duties of a terminated employee among the remaining employees does not constitute replacement.")

Additionally, the plaintiff has provided no persuasive authority for his argument in his brief that, because evidence exists that Davis offered the plaintiff's job (months before his termination) to two younger coworkers who declined the opportunity, the plaintiff has satisfied the fourth element of his *prima facie* case. Because the plaintiff concedes that it is undisputed that he was not replaced, the court cannot conclude that a question of fact exists for the jury as to whether or not the plaintiff was replaced. For this reason, the plaintiff has failed to demonstrate his *prima facie* case and summary judgment is appropriate for the defendant.

This conclusion could end the analysis. However, even if the court were to conclude that the plaintiff had established his *prima facie* case, Tyco has articulated a legitimate, non-discriminatory reason for Dillard's termination, and he has failed to rebut that reason with sufficient evidence of pretext.

### 2. Legitimate, Non-Discriminatory Reason

Tyco states that Dillard was terminated because of his failure to meet performance expectations, including his consistent failure to meet his sales quotas and to learn the Compass system, an essential part of his job responsibilities. The plaintiff's poor performance record is supported by ample evidence and is undisputed by the plaintiff.

15

3. <u>Pretext</u>

Because Tyco has articulated a legitimate, non-discriminatory reason for Dillard's termination, the burden shifts back to him to show that this reason is a pretext for intentional age discrimination by a preponderance of the evidence. Dillard may demonstrate pretext by proving "(1) that the proferred reasons had no basis *in fact*; (2) that the proferred reasons did not *actually* motivate [his discharge], or (3) that they were *insufficient* to motivate discharge." *Blizzard v. Marion Technical College*, 698 F.3d 275, 285 (6th Cir. 2012) (emphases in original) (additional citations omitted). "The three-part test need not be applied rigidly. Rather, pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Id.*

Dillard advances all three arguments in support of his contention that his termination was a pretext for age discrimination.

a. *Was Plaintiff's Conduct Sufficient to Motivate Termination?*

First, Dillard argues that he may establish pretext because Tyco's proferred reason for his dismissal was insufficient to motivate his termination. "Such insufficiency is often established through evidence demonstrating 'that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff.'" *Rutherford v. Britthaven, Inc.*, 452 F. App'x 667, 671 (6th Cir. 2011) (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). The Sixth Circuit has instructed that, to be similarly situated,

> the individuals with whom the plaintiff seeks to compare his treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Smith v. Leggett Wire Co.*, 220 F.3d 752, 762 (6th Cir. 2000). Exact equivalence is not required. "Rather, the plaintiff and the employee with whom the plaintiff seeks to compare . . . [himself] must be similar in all the *relevant* aspects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998).

Dillard asserts that he is similarly situated to three other Tyco sales representatives outside of his protected class: Braden, Hudson, and Piasecki. Although evidence exists in the record that establishes that each of these three sales representatives has gone through isolated disciplinary phases, including PIPs, there is no evidence to suggest that any of the younger sales representatives exhibited systematic performance problems (like Dillard). Each of Dillard's comparators testified that his or her work performance varied—but no evidence suggests that Braden's, Hudson's, or Piasecki's performances declined and remained below expectations for a period of months. (*See* Docket No. 26, Exs. 1, 4, 5.) Moreover, it appears to be undisputed that Dillard was the only employee in the Nashville office to receive multiple written warnings for failure to consistently meet his sales quotas and to properly use the Compass system.[4] (*See* Docket No. 30.) It is further undisputed that, throughout his long employment at Tyco (and its affiliates), Tyco disciplined Dillard several times with CIFs and PIPs, particularly between 2008 and 2010. Nevertheless, Tyco did not terminate Dillard on those occasions because his performance improved following the isolated disciplinary actions.

---

[4] The defendant submitted evidence with respect to Dillard's status as the lone recipient of multiple written warnings with its Reply—after the plaintiff filed his Response in opposition to the pending motion. The plaintiff has not requested leave to challenge this evidence or given any other indication that he disputes the validity or admissibility of the evidence.

The undisputed facts in the record appear to establish that it was not until Dillard was disciplined and *failed to improve* that Tyco terminated him.[5]  The court concludes that, on this ground, the plaintiff has failed to present evidence from which the jury could reasonably reject Tyco's explanation for his termination and infer that Tyco intentionally discriminated against him.[6]

   b. *Did Tyco's Preferred Reason Actually Motivate the Termination?*

Second, the plaintiff asserts that "Davis' discriminatory statements undermine whether defendant's reasons for plaintiff's termination are based in fact."  Despite the plaintiff's use of the words, "*based in fact*," the plaintiff appears to be arguing that Davis's statements at the meeting following Dillard's termination indicate that Dillard's performance issues did not actually motivate his termination.  Specifically, Dillard argues that, because Davis told his employees that Tyco was searching for "fresh faces" with "no industry experience" for the new role in the office, Davis's statements are evidence of discriminatory animus.

---

[5] This pattern of events is consistent with evidence in the record that, in 2013, Davis terminated a 26-year-old sales representative in Chattanooga for poor sales performance, apparently after the representative failed to show improvement in performance following a PIP.

[6] The court is also unpersuaded by the plaintiff's contention that, because Davis sometimes offered Dillard's resale leads to other sales representatives in the Nashville office, Davis was "sabotag[ing] plaintiff's ability to meet sales goals."  The record is replete with evidence demonstrating that Dillard was failing to perform because he (a) failed to meet his sales quotas and (b) lacked the skills to use Compass to find more sales leads.  Additionally, it appears undisputed that the resale leads that were allegedly "diverted" were still available to the plaintiff at all times on the Compass system and that he could have followed those leads to make sales if he knew how to use the system.  Consequently, the court cannot conclude that Davis's actions— which appear to have been intended to boost the performance of his entire team and pick up Dillard's slack—were intended to "sabotage" Dillard and drive his performance down.

When assessing discriminatory remarks made by a speaker with managerial authority, such as Davis, the court must also assess the substance of the remarks "in determining their relevancy to a plaintiff's claim that an impermissible remark motivated the adverse employment action taken against him or her." *Ercegovich*, 154 F.3d at 355. "Isolated and ambiguous comments are too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination." *Id.* (additional citations omitted).

Here, the court concludes that the plaintiff has failed to present sufficient evidence from which a reasonable jury could conclude that Tyco fired Dillard because of his age, rather than because of his poor performance. The undisputed facts demonstrate that Davis made comments regarding open positions at Tyco that the company wanted to fill with candidates who did not possess industry experience. There is no evidence in the record that Davis's comments were related in any way to Dillard, his termination, or Dillard's former role. Moreover, it appears to be undisputed that not one person in the meeting understood that Davis was indicating that the company was seeking *younger* individuals to replace Dillard (or to otherwise work for the team). Instead, it is undisputed that Davis communicated Tyco's desire to hire individuals who were *new* to the industry—not necessarily young. Moreover, Davis has submitted testimony that his comments were relevant only to a *new* position at Tyco in business sales. Even viewing the evidence in a light most favorable to Dillard, there is insufficient evidence with respect to Davis's comments to establish by a preponderance of the evidence that discriminatory animus— and not Dillard's poor performance—actually motivated his termination.

    c.  *Does Tyco's Proferred Reason Have Basis in Fact?*

Finally, Dillard argues that Tyco's preferred reason for his discharge has "no basis in fact" because there is a question of fact as to whether or not Dillard used the Compass system correctly.

A reason has "no basis in fact" when it is "factually false." *Manzer*, 29 F.3d at 1084. When an employee argues that the pretext inquiry has no basis in fact, the Sixth Circuit utilizes a modified version of the "honest belief" rule:

> Under this rule, an employer's preferred reason is considered honestly held where the employer can establish it reasonably relied on the particularized facts that were before it at the time the decision was made. Thereafter, the burden is on the plaintiff to demonstrate that the employer's belief was not honestly held. An employee's bare assertion that the employer's preferred reason has no basis in fact is insufficient to call an employer's honest belief into question, and fails to create a genuine issue of material fact.

*Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012); *see also Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 526 (6th Cir. 2008) (in ADEA case, stating that "the plaintiff must produce sufficient evidence from which the jury could reasonably reject the defendants' explanation and infer that the defendants . . . did not honestly believe the proffered nondiscriminatory reason for its adverse employment action.") To overcome an employer's honest belief, a plaintiff must show more than a dispute over the facts upon which the discharge was based. *Seeger*, 681 F.3d at 285. The employer's decision-making process under scrutiny is not required to be "optimal or leave no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.*

Here, Dillard's factual challenge to Tyco's legitimate, non-discriminatory reason for his dismissal is merely his contention that "there is a question of fact" as to whether or not he used the Compass system appropriately. Dillard bases this challenge on his own deposition testimony

that he believed that he was using Compass correctly and Braden's testimony at deposition that Compass is not "user-friendly." As noted above, however, it is well settled that, to overcome an employer's honest belief with respect to its preferred reason (which is well supported here by evidence of Dillard's poor performance), a plaintiff must show *more* than a dispute over the facts upon which the discharge is based. *Seeger*, 681 F.3d at 285. Dillard has not met that burden. Accordingly, the plaintiff has failed to demonstrate pretext on the ground that the defendant's proferred reason for his dismissal has no basis in fact.

For these reasons, the plaintiff has failed to provide sufficient evidence to meet his evidentiary burden on any of the three theories of pretext. Accordingly, even if the plaintiff had successfully set out a *prima facie* case for age discrimination, the defendant is entitled to summary judgment with respect to the plaintiff's age discrimination claims.

## CONCLUSION

For these reasons, the defendant's Motion for Summary Judgment will be granted and the plaintiff's claims will be dismissed.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge